1                   UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF INDIANA
2                        HAMMOND DIVISION

3    UNITED STATES OF AMERICA,      )
                                    )
4         Plaintiff,                )
                                    )
5    vs.                            ) 2:18-CR-37
                                    )
6    CHARLES TAYLOR,                )
                                    )
7         Defendant.                )

8               TRANSCRIPT OF REVIEW OF DETENTION
                      August 27, 2018
9             BEFORE THE HONORABLE PHILIP P. SIMON
                 UNITED STATES DISTRICT JUDGE
10

11

12   A P P E A R A N C E S:

13   FOR THE GOVERNMENT:

14                      THOMAS R. MAHONEY
                       United States Attorney's Office
15                     5400 Federal Plaza, Suite 1500
                       Hammond, Indiana  46320
16                     (219) 937-5500

17   FOR THE DEFENDANT:

18                      PAUL G. STRACCI
                       Stracci Criminal Defense, PC
19                     9205 Broadway, Suite B
                       Merrillville, Indiana  46410
20                     (219) 525-1000

21   ALSO PRESENT:      Jerry Navarra, U.S. Probation

22

23

24

25

```
 1          (The following proceedings were held in open court

 2          beginning at 10:26 a.m., reported as follows:)

 3              DEPUTY CLERK:  All rise.

 4              THE COURT:  You can be seated.

 5          Good morning, everyone.

 6              MR. MAHONEY:  Good morning, Your Honor.

 7              MR. STRACCI:  Good morning, Your Honor.  I apologize

 8     for the delay.

 9              THE COURT:  We're on the record in Cause

10     No. 2:18-CR-37.  The case is United States versus

11     Charles Taylor.  We're here for a review of the detention order

12     of --

13          Was it Martin?

14              MR. STRACCI:  Yes.  Yes, Your Honor.

15              THE COURT:  -- Magistrate Judge Martin.

16          And so the defendant, Mr. Taylor, is here with his lawyer,

17     Mr. Stracci.  Mr. Mahoney is here on behalf of the government.

18          This is, of course, a de novo hearing, so -- I have

19     reviewed the transcript of the proceedings that took place

20     before the magistrate judge a number of months ago, in June.

21          So what are we doing here today, Mr. Stracci?

22              MR. STRACCI:  Your Honor, we were going to call one

23     witness and present some exhibits and then, obviously, make

24     argument.

25              THE COURT:  Okay.  And this witness is different from
```

1    Ms. Meyers, or is it the same --

2             **MR. STRACCI:**  It is the same witness, and I won't go

3    over the same -- I won't plow that same field.

4             **THE COURT:**  I'm sorry to interrupt.  I only got

5    through half of this thing this morning, so present what you

6    want to present.  It's a *de novo* hearing.

7             **MR. STRACCI:**  Okay.

8             **THE COURT:**  Why don't we start with the government.

9        Mr. Mahoney, what is your -- first of all, let me ask

10   this:  Are you saying that this defendant is both a flight risk

11   and a danger to the community, or are you only proceeding under

12   the dangerous prong?

13            **MR. MAHONEY:**  No, Your Honor, we're proceeding under

14   both.  And that's the way we proceeded at the initial detention

15   hearing.  It's our --

16            **THE COURT:**  What's the evidence that he is a flight

17   risk?

18            **MR. MAHONEY:**  Failures to appear --

19            **THE COURT:**  What are you looking at?

20            **MR. MAHONEY:**  -- failures to comply with

21   conditions -- previously imposed conditions of probation by the

22   courts.

23            **THE COURT:**  I don't have a copy of the bond report.

24   Why isn't there somebody from probation here either?

25            **DEPUTY CLERK:**  I can call.

```
 1              THE COURT:  I don't understand this.  Do you have a

 2   copy of the bond report?

 3              MR. MAHONEY:  I do.  Can you give me one moment,

 4   Judge?

 5              THE COURT:  Can I see that?

 6              MR. MAHONEY:  I have actually an extra one.  Just

 7   give me a moment, Your Honor.  I'll grab that.

 8              THE COURT:  Sure.

 9              MR. STRACCI:  May I approach, Judge?

10              THE COURT:  Yeah, sure.

11              MR. MAHONEY:  Do you have it?

12              THE COURT:  Yeah, I have it here.

13        Okay.  Go ahead, Mr. Mahoney.

14              MR. MAHONEY:  Your Honor, that's what we presented to

15   Judge Martin at the initial detention hearing.  We also --

16              THE COURT:  Can you show me where the FTAs are on

17   this just so -- I'm playing catch-up here with you.

18        I guess what I'm saying is, it just doesn't strike me as a

19   strong case that he's a flight risk.

20              MR. MAHONEY:  Well -- and I agree with you.  But what

21   we do strongly urge the Court to consider is based on his

22   criminal history, and based on a history of some violent

23   conduct, that he is a danger to the community; and that's

24   why -- I don't know if I emphasized that -- and I didn't have

25   the benefit of -- I ordered the transcript.  I didn't get it,
```

1    so I do remember what I said at the hearing though, Your Honor,

2    and what we -- what our strongest argument was for detention,

3    and that's that he's a danger to the community.  I can go

4    through and state those reasons if you would like me to do that

5    now.

6              **THE COURT:**  Yeah, that would be helpful.

7              **MR. MAHONEY:**  Certainly.

8              **THE COURT:**  This is your chance to --

9              **MR. MAHONEY:**  And the other thing I would like, for

10   the record, that, Your Honor, this is a presumptive hearing.

11   There is a presumption of detention, and we believe that we

12   correctly stated that to Judge Martin and that we correctly

13   persuaded Judge Martin that that presumption was not rebutted

14   at the initial hearing.

15       So from there, what I would like to point out to the

16   Court, that we look at Mr. Taylor's criminal history going back

17   to contacts with the criminal justice system all the way back

18   to 1996 in Chicago.  And I know these were minor offenses that

19   were stricken off with leave to reinstate in the Cook County

20   Circuit Court; but when we turn to age 29 in 2008, he's got a

21   conviction for domestic battery.

22             **MR. STRACCI:**  I'm sorry; page 29 of what document?

23             **MR. MAHONEY:**  No, "age 29."

24             **MR. STRACCI:**  "Age 29."

25             **MR. MAHONEY:**  Age 29 on page 4 of the bond report.

1        You have a domestic battery in Tippecanoe County.

2   Defendant was convicted; 365 days in jail, suspended.

3        As soon as -- from October conviction to December, there's

4   a petition to revoke the probation.  Admission to those

5   violations, and then he is resentenced to a term of jail of 143

6   days.

7        Next time we go to July of 2009.  Now we've got a felony

8   domestic battery in his background where he receives a two-year

9   prison sentence that's suspended.  Again, he gets a term of

10  probation connected with that, and there's a petition to

11  revoke.  It was dismissed.  However, there was an allegation

12  that he wasn't complying with his probation.

13       Move now to 2011, Your Honor, more serious.  You've got a

14  strangulation count in connection with a domestic violence

15  incident.  So there's a pattern.

16       **THE COURT:**  He was charged with that but not

17  convicted.

18       **MR. MAHONEY:**  Charged with that.  I was going to

19  clear that up too, Your Honor.  I'm not -- but he ends up

20  getting, it looks like, just about two years in prison.  Again,

21  suspended term.  And, again, a violation that -- the petition

22  to revoke that probation that followed the term of jail in

23  2011, and then another arrest for domestic violence in 2013

24  that was dismissed.

25       I think if you look at Mr. Taylor, there's a history of

1    violence in his background.  I know at the initial hearing

2    Mr. Stracci made the arguments that those domestic violence

3    incidents were related to a prior bad marriage or a prior very

4    toxic relationship.  I don't dispute that, but they still

5    occurred.  They still occurred, and that was the basis for our

6    argument that this man is a danger to the community.

7        Presumption of detention, we don't believe the presumption

8    has been rebutted, and that's how we are going to ask the Court

9    to rule again today.

10       **THE COURT:**  Under 3142(g)(1), one of the factors I

11   have to take into account is the weight of the evidence -- it's

12   3142(g)(2) -- the weight of the evidence against the person.

13   So can you speak to what this case is about --

14       **MR. MAHONEY:**  Yes.

15       **THE COURT:**  -- what is the weight of the evidence?

16       **MR. MAHONEY:**  Yes.

17       **THE COURT:**  And, Mr. Stracci, I want you to listen

18   closely to what he has to say 'cause I'm going to ask you if

19   you agree or disagree with it, if you take issue with any of

20   it, because it's based on proffer.

21       **MR. MAHONEY:**  It is my proffer, Your Honor, but this

22   is what we believe the evidence would show.  This is what the

23   charging decisions were based on.

24       Just to give the Court a little bit of background, this

25   was a Title 3 case.  There was approximately 60 days of

1    conversations that were recorded pursuant to an order issued by

2    the Honorable Joseph Van Bokkelen in this courthouse.

3        During the time of the intercepts, Mr. Taylor, who was an

4    interceptee, who was a violator, Charles Taylor and

5    Lamonte Adams -- Lamonte Adams is one of the principals in this

6    case.  He was the initial target.  He was dealing

7    methamphetamine with people from California, with a man from

8    Brownsville, Texas, who also had ties to contacts down in

9    Mexico that we believe were cartel based.

10        However, Mr. Taylor's involvement, we had over 90

11   pertinent calls and text messages during the course of the

12   conspiracy between Charles Taylor and Lamonte Adams.

13        During calls on November 11th, 2017, and November 12 of

14   2017, we believed Adams was down in Brownsville, Texas, meeting

15   with another target, an unindicted -- at this time, unindicted

16   co-conspirator.  And the quotes off of the calls, Lamonte Adams

17   tells Charles Taylor, and I apologize for the language, but,

18   "I'm doing some big shit right now.  You fin to be a part of

19   it.  And, hey, listen G, you fin to be a part of this shit,

20   man."

21        These calls were made while Adams was in Brownsville,

22   Texas, meeting with another target.  Adams advised Taylor,

23   don't tell others about the business that they do together.

24   The calls also indicate that Taylor has fronted drugs -- or

25   that Adams, I'm sorry, Adams has fronted drugs to Taylor.

```
 1        Mr. Taylor advises Adams, be careful who he does business
 2   with, and the person -- that a person named "Joker" may be
 3   working with the police.
 4        Mr. Taylor also agrees to serve one of Adams' drug
 5   customers because Adams was busy.
 6        The calls also indicated that Adams and Taylor are dealing
 7   narcotics with a man named Kyle Lehnan.  Kyle Lehnan is also
 8   part of this Indictment.  Taylor tells Adams that Kyle Lehnan
 9   owes him money and that Kyle Lehnan's wife, Corine, tried to
10   deal him in -- or tried to deal with him but Taylor didn't like
11   to deal with other people's women.
12        In January of 2018, Taylor and Adams have a dispute over
13   money.  Adams tells Taylor he just took a $60,000 hit, and then
14   they further, again, discuss how much money Kyle Lehnan owes
15   them.
16        So based on these calls and these conversations and what
17   was said by Mr. Taylor between him and Adams, that's the
18   evidence that we believe we would present during a trial of
19   this matter to a jury.
20           THE COURT:  Were there any undercover purchases made
21   from this defendant?
22           MR. MAHONEY:  No.  No.
23           THE COURT:  Any CI information regarding -- is it all
24   pretty much the Title 3 intercepts?
25           MR. MAHONEY:  With respect to him, yes, it is.
```

1    Generally, yes.

2          **THE COURT:**  All right.  Anything else you want to

3    present, Mr. Mahoney?

4          **MR. MAHONEY:**  No, Your Honor.

5          **THE COURT:**  All right.

6       Mr. Stracci, you want to start with your witness and

7    then -- whatever you want to do.  However you want to proceed.

8          **MR. STRACCI:**  If that would be okay with the Court.

9    I guess, maybe, if the Court doesn't mind, since we're on this

10   topic, can I talk about the government's evidence in the case?

11         **THE COURT:**  Sure.

12         **MR. STRACCI:**  So I would just say this, Judge:  As

13   the Court's aware, this is a 12-count Indictment.  My client is

14   charged not with an individual count in any of them.  He's

15   merely charged with the overall conspiracy count, so one of 12

16   counts.

17      The government indicated previously when it proffered that

18   my client made approximately 90 pertinent phone calls and/or

19   text messages with Mr. Adams.  As the Court's aware from page 5

20   of our memorandum, again, government is absolutely right,

21   that's about a 60-day period.  That during that period,

22   Mr. Adams made 8,214 contacts, of which approximately 90 of

23   those were with our client.

24      And when the government summarizes the evidence of some of

25   these phone calls, what we have is, essentially, Mr. Adams

1    saying, "I want you to be a part of this.  I want -- there's

2    going to be some big shit."

3         It's not my client saying, "Oh, yeah, I can't wait for

4    that to happen," or "Oh, yeah, let's get me some stuff."

5    There's nothing like that.

6         There is a recording where my client indicates that, "Oh,

7    yeah, I'll take care of your client," as the government alluded

8    to, that he would serve one of Mr. Adams' clients.  However,

9    there's no indication that that ever occurred.  It's merely my

10   client paying lip service to Mr. Adams.

11        And so as a result, I would say that the strength of the

12   government's case against my individual client is not good, is

13   not strong, and I would certainly ask the Court to consider

14   that as required.

15        At this time then, Judge, if I may call my witness?

16             **THE COURT:**  Yeah, sure.  Of course.

17             **MR. STRACCI:**  Erin Meyers.

18             **THE COURT:**  Ma'am, if you would, please raise your

19   right hand to be sworn in.  This lady is going to swear you in.

20        *(The oath was administered.)*

21             **THE WITNESS:**  I do.

22             **MR. STRACCI:**  Judge, did you have the opportunity to

23   review that much of the transcript that indicates her

24   background and her relationship with the defendant?

25             **THE COURT:**  Why don't you do the whole thing.

1    **MR. STRACCI:**  Very good.

2              ERIN MEYERS, DEFENDANT'S WITNESS, SWORN

3                       **DIRECT EXAMINATION**

4    **Q.**  Ms. Meyers, if you would, please state and spell your full

5    name for the record.

6    **A.**  Erin Meyers, E-R-I-N, M-E-Y-E-R-S.

7    **Q.**  How do you know Mr. Charles Taylor?

8    **A.**  I've been with him for the last six years.  We've been

9    engaged for the last two years.

10   **Q.**  When you say "with him," you mean romantically, correct?

11   **A.**  Yes, yes.

12   **Q.**  And over that six-year period, how long did the two of you

13   reside together?

14   **A.**  The whole six years.

15   **Q.**  Okay.  And where did you live together?

16   **A.**  In West Lafayette.

17   **Q.**  Okay.  Indiana, correct?

18   **A.**  Yes.

19   **Q.**  All right.  And who else lived with you?

20   **A.**  It was just me and him.

21   **Q.**  Okay.  Until recently, is that right?

22   **A.**  Yes, yes.

23   **Q.**  If you can tell the judge how that changed.

24   **A.**  That changed because we moved in with his children, and we

25   moved out of West Lafayette into West Lafayette [verbatim] with

1  his children.

2  **Q.**   Why did you do that?

3  **A.**   We just didn't have money to pay the bills anymore.

4  **Q.**   Okay.  It was more affordable for everybody, is that

5  right?

6  **A.**   Yes.

7  **Q.**   He wasn't required to pay rent at his stepson's house,

8  correct?

9  **A.**   No.

10  **Q.**   Am I correct?

11  **A.**   Yes.

12  **Q.**   Okay.  And since you've known him, has he maintained

13  consistent employment?

14  **A.**   Yes.

15  **Q.**   All right.  And are you aware of any acts -- any criminal

16  acts since you've known him?

17  **A.**   No.

18  **Q.**   Okay.  And outside of this matter, have you ever had to

19  attend court with him?

20  **A.**   No.

21  **Q.**   Okay.  Now, you heard that there was some allegations that

22  earlier in his life he was involved in some domestic violence

23  episodes, is that right?

24  **A.**   Correct.

25  **Q.**   Since you've known him, has he in any way even given hints

1   of an ability to be violent?

2   **A.**   No.

3   **Q.**   All right.  He's never in any way been violent with you?

4   **A.**   No.

5   **Q.**   You've never witnessed him be violent with anyone?

6   **A.**   No.

7   **Q.**   Okay.  And I think you said to myself and Ms. Benjamin

8   earlier that you find it very hard to believe that the domestic

9   violence allegations were true, knowing Charles, is that fair?

10  **A.**   Correct.

11  **Q.**   That's what you told us?

12  **A.**   Correct.

13  **Q.**   Okay.  All right.  So that said, when Mr. Taylor came into

14  this building, he had a heroin addiction, is that right?

15  **A.**   Correct.

16  **Q.**   Was he the only one in this relationship with a heroin

17  addiction?

18  **A.**   No.

19  **Q.**   Who else had a heroin addiction?

20  **A.**   I did.

21  **Q.**   Did you address your heroin addiction?

22  **A.**   I did.

23  **Q.**   How did you do that?  Please tell the Court.

24  **A.**   I went to an inpatient program at Valle Vista in

25  Greenwood, Indiana, and went through detox, got clean.  They

1   set me up with therapy and a psych doctor and then also a

2   Suboxone doctor.

3   **Q.**   Okay.  And tell us -- that was how long ago, first of all?

4   **A.**   May.

5   **Q.**   Okay.  And you've been clean for how long now?

6   **A.**   Four-and-a-half months.

7   **Q.**   Okay.  And since that time, you've continued therapy, is

8   that right?

9   **A.**   Correct.

10  **Q.**   Are you in therapy today?

11  **A.**   Yes.

12  **Q.**   And other than Suboxone, do you take any medications?

13  **A.**   No.

14  **Q.**   And you haven't used at all in that period of time?

15  **A.**   No.

16  **Q.**   All right.  And can you just be a little bit more specific

17  as to, sort of, what your routine has become today when it

18  comes to treatment?

19  **A.**   I go to NA meetings during the week, and I also go to my

20  therapist once every two weeks.  I go see my psych doctor once

21  a month.  And then Suboxone, I go once a week.  And you go in

22  and they drug test you, make sure you're clean, and then they

23  just go over what you have done for the last week.  And then

24  they give you the Suboxone, and you come back the next week and

25  do the same thing.

1    **Q.**    Okay.  And if you know, has Charles been able to receive

2    any care for his addiction while at the Porter County jail?

3    **A.**    No.

4    **Q.**    Do you know why?

5    **A.**    He said since it's a federal thing, they won't let him

6    leave the pod to get any help with anything.

7    **Q.**    Okay.  Essentially, they don't let him participate?

8    **A.**    Correct.

9    **Q.**    All right.  So did you do some work to try to find help

10   for Charles should he be released with his addiction?

11   **A.**    I did.

12   **Q.**    Okay.  And where did you go to do that?

13   **A.**    Wabash Valley in Lafayette, Indiana.  It's a 16-week

14   intensive outpatient program.  They also drug test you every

15   time you go in.  You go three to four times a week.  It's

16   pretty intense.  They make sure that you stay clean.  They give

17   you the tools to help you stay clean, and they try to find the

18   trigger points of why you're doing what you're doing.

19        I also went to my Suboxone doctor and asked if he was

20   taking new patients.  He said he was.  They do take his

21   insurance, and my therapist also said at Wabash that he would

22   see him as well to do therapy and to get a psych evaluation.

23   **Q.**    Okay.

24            **MR. STRACCI:**  Your Honor, may I approach the witness?

25            **THE COURT:**  (Nodding.)

1   BY MR. STRACCI:

2   Q.   Ms. Meyers, I'm showing you what are previously marked as

3   Defendant's Exhibits A and B.  Do you recognize those

4   documents?

5   A.   I do.

6   Q.   Okay.  And just briefly, can you tell the Court what they

7   are.

8   A.   These are the documents from Wabash Valley Hospital.  It

9   goes over all the programs they have.  It explains, like, the

10  psychiatric doctor, the therapist.  It explains the intensive

11  outpatient program.  You just walk in.  It's Tuesdays and

12  Thursdays.  They do a walk-in evaluation, and then they set you

13  up with the treatment that you need.

14  Q.   Okay.  So they don't have an inpatient program, but they

15  do have intensive outpatient and then follow-up treatment that

16  could go on for as long as Charles needed, is that correct?

17  A.   Correct.

18  Q.   Okay.  And you've had success at the program?

19  A.   Correct.

20        MR. STRACCI:  Your Honor, I would ask to admit the

21  exhibits.

22        THE COURT:  Any objection?

23        MR. MAHONEY:  No objection.

24        THE COURT:  All right.  A and B are admitted.

25  \\\

1    **BY MR. STRACCI:**

2    **Q.**   And in addition to Charles' drug problem, we talked about

3    the fact that Charles doesn't have a lot of money and has

4    been -- was employed at the time this occurred, is that right?

5    **A.**   Correct.

6    **Q.**   So I guess let's start with employment.  What's Charles

7    going to do about employment?  Do you know?

8    **A.**   If released, they told me that they would accept him right

9    back.  Like, he's never been fired, terminated, anything.  He

10   still has his job.

11   **Q.**   Okay.  But let's tell the judge who "they" is?

12   **A.**   It is the general manager, Tom Carrillo.  I believe he

13   wrote a letter stating about Charles' character, and he also

14   wrote a letter stating that he is still employed at McDonald's

15   if released.

16   **Q.**   And we also have a letter from Mr. Carrillo indicating

17   just that, that he would be willing to take Charles back and

18   that, essentially, he was an asset, is that correct?

19   **A.**   Correct.

20   **Q.**   Okay.  And it's true that Charles was actually arrested

21   inside of that McDonald's; that's where they served the arrest

22   warrant, is that right?

23   **A.**   Correct.

24   **Q.**   And yet McDonald's is still willing to take him back, is

25   that correct?

1    **A.**   Correct.

2    **Q.**   Okay.  He was a part-time employee at that time, is that

3    correct?

4    **A.**   It was between full time and part time.  Some weeks it was

5    20 hours; some weeks it was 40 hours.

6    **Q.**   Okay.  Do you happen to know if the arrangement will be

7    the same?

8    **A.**   It definitely will be full time plus, because right now

9    I'm working 60, 70 hours a week because we have no staff.  So

10   it will be a lot of hours.

11   **Q.**   Okay.  And so just to be real clear, you still work at

12   that same McDonald's, right?

13   **A.**   Correct.  Correct.

14   **Q.**   Okay.

15        **MR. STRACCI:**  Your Honor, I'm going to ask to

16   approach with Defendant's Exhibits C and D and would ask the

17   Court to admit them.  They are a letter from Mr. Thomas

18   Carrillo indicating what we just discussed, and then

19   Defendant's Exhibit D is an e-mail from Mr. Carrillo sent

20   through his McDonald's e-mail address just indicating that at

21   the time, which was August 24th of 2018, that Mr. Taylor is

22   still currently employed at McDonald's Corporation.

23        **THE COURT:**  You have any objection to C or D?

24        **MR. MAHONEY:**  No, Your Honor.

25        **THE COURT:**  They are both admitted.

1        **MR. STRACCI:**  Thank you, Judge.

2  **BY MR. STRACCI:**

3  **Q.**   Okay.  So you've got his rehabilitation covered.  You have

4  employment covered.  The last thing is living arrangement.

5  Have you made -- is there an appropriate place for Charles to

6  live?

7  **A.**   Yes.

8  **Q.**   Okay.  Can you tell us about that.

9  **A.**   Her name is Haley, and she is actually a manager at

10  McDonald's, and said that he is welcome to stay there as long

11  as it takes.

12  **Q.**   Okay.  So her name is Haley Jaworski, is that right?

13  **A.**   Correct.

14  **Q.**   She also resides in West Lafayette?

15  **A.**   Correct.

16  **Q.**   Okay.  And she also wrote -- and, in fact, she wrote a

17  rather lengthy letter indicating that she's, in fact -- she's a

18  swing manager with McDonald's, is that right?

19  **A.**   Correct.

20  **Q.**   That she and her husband have taken in people who have had

21  issues similar to Charles' in the past, is that right?

22  **A.**   Correct.

23  **Q.**   She indicates that she has a four-bedroom home and that

24  Charles would have his own bedroom and own bathroom, is that

25  right?

 1  **A.**    Yes.

 2  **Q.**    She lives there with her husband, who I believe is

 3  currently out of state training as an air traffic controller?

 4  **A.**    Correct.

 5  **Q.**    Okay.  And that she has a brother and, I believe, her

 6  fiancé's son -- so it's not her husband, I guess, it's her

 7  fiancé -- and her fiancé's sons who have rooms there but who

 8  rarely actually reside with them?

 9  **A.**    Correct.

10  **Q.**    Okay.  She also indicated that she understands that the

11  probation officer can visit the house as necessary given

12  Charles' situation, she didn't have any objection to that, and

13  also indicated that there are no drugs or alcohol that will be

14  allowed in her home -- no drugs are ever allowed in her home --

15  but she wouldn't allow alcohol while Charles stayed there, is

16  that right?

17  **A.**    Yes.

18  **Q.**    She also indicates that she understands there may be some

19  confines as far as Charles' ability to come and go --

20  essentially, referring to home monitoring -- and she's also

21  okay with that, is that right?

22  **A.**    Yes.

23  **Q.**    But she's very frank, and she says that her husband may

24  get relocated and that come mid-October -- well, it could

25  happen as early as mid-October -- she doesn't know if it will

1  happen or when it will happen, but theoretically it could

2  happen as early as mid-October?

3  **A.**   Correct.

4  **Q.**   Do you have a plan with how to deal with that?

5  **A.**   Yes.  I'm currently, actually, saving up money to get my

6  own place for us to live in, so it's just a temporary situation

7  until we can actually get our own place.

8  **Q.**   Will she be charging you rent?

9  **A.**   Yes.

10  **Q.**   Okay.  And that rent is just for one bedroom, is that

11  right?

12  **A.**   Correct.

13  **Q.**   Did you discuss the dollar amount of the rent?

14  **A.**   200.

15  **Q.**   Two hundred dollars a month?

16  **A.**   Yes.

17  **Q.**   She indicates here, right, that the purpose of this is to

18  give you a chance to save money to get your own place?

19  **A.**   Correct.

20  **Q.**   Okay.  Obviously, with the idea that you would both be

21  working.

22          **MR. STRACCI:**  Judge, if I may approach with

23  Defendant's Exhibit E.  I also have a Defendant's Exhibit F,

24  which is just -- I'm not sure if the Court is familiar with

25  Indiana state's new online system.  I believe it covers most

1   but not every county in the state.  We did do a criminal

2   background on Haley Jaworski.  It does indicate that there was

3   a prior conversion in 2012, but she was given a pretrial

4   diversion program, which she successfully completed.  So it

5   doesn't appear as though she has a criminal history.

6        If I may?

7            **THE COURT:**  (No audible response.)

8   **BY MR. STRACCI:**

9   **Q.**   Okay.  So to sort of summarize, Charles is a gentleman who

10  you've known for now six years and have seen no instances of a

11  propensity for violence?

12  **A.**   Correct.

13  **Q.**   He's a drug user or was a drug user?

14  **A.**   Correct.

15  **Q.**   You have taken substantial steps to get clean and are in

16  the process of trying to help him do the same?

17  **A.**   Correct.

18  **Q.**   All right.  He has employment and living arrangements

19  available to him that would allow him to get back to work and

20  actually get the treatment that he needs and is being deprived

21  of at this time?

22  **A.**   Yes.

23  **Q.**   Is that right?

24  **A.**   Yes.

25  **Q.**   Do you have any concerns with Charles being released from

 1   custody at all?

 2   **A.**    I do not.

 3   **Q.**    Okay.

 4          **MR. STRACCI:**  I don't have any further questions.

 5   Thank you, Judge.

 6          **THE COURT:**  Mr. Mahoney?

 7          **MR. MAHONEY:**  Just a couple questions, Your Honor.

 8          **THE COURT:**  Sure.

 9                      **CROSS-EXAMINATION**

10   BY MR. MAHONEY:

11   **Q.**    Good morning, Ms. Meyers.

12   **A.**    Good morning.

13   **Q.**    You testified a few months back at Mr. Taylor's initial

14   detention hearing before another judge, is that correct?

15   **A.**    Yes.

16   **Q.**    Today you've told us a few more things than you told back

17   then, correct?

18   **A.**    Correct.

19   **Q.**    You've made some arrangements for drug treatment?

20   **A.**    Yes.

21   **Q.**    You made some living arrangements.  Only question I have

22   is:  Back when Charles was arrested, you were living together,

23   correct?

24   **A.**    Correct.

25   **Q.**    You were living with his children?

1   **A.**   Yes.

2   **Q.**   Did you have children?

3   **A.**   I do have children, yes.

4   **Q.**   How many children do you have?

5   **A.**   Three.

6   **Q.**   And these arrangements you made with Ms. Jaworski, that's

7   just for Charles, correct?

8   **A.**   Correct.

9   **Q.**   Is there a reason Charles can't live with you?

10  **A.**   Right now I stay with my brother, and my daughter, she

11  just had a baby, so that's why I moved out from his kids' and

12  with my daughter, so I could help her take care of her baby

13  right now.

14  **Q.**   All right.  That's all I want.  That's all I needed to

15  know.  Thank you.

16          **THE COURT:**  So you're not intending to move into the

17  home of this lady who's the manager at McDonald's?

18          **THE WITNESS:**  No.  I'm going to stay with my

19  daughter --

20          **THE COURT:**  Just the defendant?

21          **THE WITNESS:**  Yes.

22      -- and help her with the baby right now.  When we get a

23  place, we can stay together.

24          **THE COURT:**  "We" being you and the defendant?

25          **THE WITNESS:**  Correct.

1          **THE COURT:**  Okay.

2          **MR. MAHONEY:**  I have nothing further.

3          **THE COURT:**  Thank you, Mr. Mahoney.

4      Anything else?

5          **MR. STRACCI:**  Nothing.  Thanks, Judge.

6          **THE COURT:**  All right.  Thank you, ma'am.  You can

7   step down.

8          **MR. STRACCI:**  No further evidence, Judge.

9          **THE COURT:**  Okay.

10      All right.  Mr. Mahoney, I'll hear from you first.

11          **MR. MAHONEY:**  Your Honor, my argument is the same as

12   it was back at the initial detention hearing.  If you look at

13   Mr. Taylor's criminal history, you look at everything that's

14   alleged in the bond report, that there's a presumption of

15   detention; that there are, according to probation, risks of

16   nonappearance, six risk factors listed there, and then we have

17   10 factors listed under his assessment of the probation

18   office's assessment of his danger to the community.

19      I understand that there's been no domestic violence or no

20   criminal history since 2013.  We get that.  However, he's got a

21   lengthy criminal history, Your Honor; and based on that, based

22   on the proffer that we gave to the Court regarding the

23   defendant's involvement in the offense in the criminal drug

24   conspiracy, Judge, I don't believe that the presumption of the

25   detention has been overcome by the defendant.  And therefore,

```
 1    we would ask that the Court continue to detain him pretrial.

 2            THE COURT:  All right.  Thank you.

 3        Mr. Stracci.

 4            MR. STRACCI:  Your Honor, I would point out, as we

 5    did in the memorandum, that although the government's

 6    absolutely correct, that there is, in fact, a rebuttable

 7    presumption in this case, that I don't believe any of the

 8    evidence in this case in any way ties my client to

 9    methamphetamine, and that the mandatory minimum and the life

10    term come out of the methamphetamine quantity as it's an

11    enumerated quantity in the conspiracy.  The heroin numbers are

12    not enumerated; and as a result, if, in fact, there were to be

13    a conviction, it's certainly a different term.  There is no

14    mandatory minimum, and instead he would be looking at not more

15    than 20.

16            THE COURT:  But the rebuttable presumption doesn't

17    matter.

18            MR. STRACCI:  It's true.  It doesn't change that.  It

19    doesn't change that.

20            THE COURT:  Okay.

21            MR. STRACCI:  I'll focus on the danger to the

22    community, as I think we've kind of tied up that that really is

23    the one issue that the government sees, that the Court sees.

24        I would point out to the Court that my client's -- well,

25    his community ties run deep, and I know that's typically a
```

 1   flight-risk argument; but I think it is important there.  He's

 2   been there for 20 years.  We're saying he's, essentially, a

 3   danger to the community because of what, really, are three

 4   domestic violence incidents, okay.

 5        These domestic violence incidents occurred between '09

 6   and, I want to say, 2012.  These domestic violence incidences

 7   were all with one particular woman, his former wife.  What you

 8   don't see here, Your Honor, was there was another charge in

 9   which my client recorded his ex-wife and the domestic violence

10   charge then -- let me make sure I'm right about this -- it was

11   dismissed outright.

12             THE COURT:  Is that the 2013 incident --

13             MR. STRACCI:  That's right.  That's the 2013

14   incident.

15             THE COURT:  -- on page 5 of the bond report?

16             MR. STRACCI:  His ex-wife began to use the Court as a

17   sword.  I, obviously, don't know when, as I wasn't involved in

18   those matters, and Mr. Taylor got smart and understood what he

19   needed to do to try to protect himself.

20        And as we point out in the memorandum, his fiancée, who

21   testified today, Ms. Meyers, indicates that she has never known

22   of the defendant to be violent; that he has had no issues of

23   domestic violence since completion of the 26-week anger

24   management program that he completed in 2013, I believe; and

25   that, therefore, this past conduct of his does not suggest

1    future misconduct is likely, which is what's important

2    statutorily or through USC.

3         I would indicate that there were no failures to appear.  I

4    think Mr. Mahoney misspoke when he said that.  There are some

5    probation violations that occurred, no hiding from that, Judge,

6    but I don't think that they raise to the level of making him a

7    flight risk -- or, excuse me, a danger.

8         He has not been a danger.  He is clean of heroin.  He

9    needs to get help.  He's being deprived of that help.  I think

10   that, particularly, in light of the conditions that this Court

11   could put on my client, there are alternatives to his being

12   detained.  I think home monitoring, substance abuse treatment

13   and testing, as Ms. Meyers indicated she was undergoing, any

14   restrictions on his personal conditions, his ability to travel,

15   that sort of thing, I think make him an excellent candidate for

16   pretrial release.

17        And I would ask the Court to find that he is not, in fact,

18   a danger to the community, that what the government really is

19   hanging its hat on is not conduct that suggests future

20   misconduct is likely.

21        The other thing, as I know it is apparent in the

22   memorandum, but his ex-wife, the woman who he had this horrible

23   toxic relationship with, is now deceased.  So there is no

24   either person or the community that he is an apparent future

25   danger to.

1      So as a result, I would ask the Court to release him on

2   whatever conditions the Court felt were appropriate.

3           **THE COURT:**  Mr. Mahoney, I'll give you the last word.

4   Anything else you wish to say?

5           **MR. MAHONEY:**  Nothing except that based on everything

6   the Court's heard, based on everything that was presented -- I

7   know it is a *de novo* hearing, but based on everything that's

8   been presented, their presumption still remains.  It has not

9   been rebutted.  Based on, primarily, his significant criminal

10  history, and I say "history of violence and violent behavior,"

11  that Mr. Taylor should be detained, Your Honor.

12          **THE COURT:**  I want to study these exhibits that were

13  presented, so just sit tight, and I'll be back out here when

14  I'm ready to give you my ruling.

15      Jerry, can I talk to you as well?

16          **MR. STRACCI:**  Thank you, Judge.

17      (A recess was had at 11:03 a.m.)

18      (The proceedings resumed in open court, at 11:13 a.m.,

19      reported as follows:)

20          **DEPUTY CLERK:**  All rise.

21          **THE COURT:**  All right.  You may be seated.

22      So under 18 U.S.C. 3142 -- that's the statute that governs

23  the release and/or detention of somebody who is charged with a

24  federal offense -- in cases in which somebody is charged with a

25  felony drug charge, there is a rebuttable presumption that

 1   there are no conditions that will adequately secure the

 2   defendant's appearance or the safety of the community; but, of

 3   course, it is a rebuttable presumption.

 4       The presumption only shifts the burden of production.  It

 5   doesn't shift the burden of persuasion.  Of course, the

 6   government, at all times, retains the burden of persuasion to

 7   prove by clear and convincing evidence that the defendant is a

 8   danger to the community or by a preponderance of the evidence

 9   that the defendant is a flight risk.

10       There are four factors that the Court has to take into

11   consideration when it decides whether or not there are

12   conditions of release that will reasonably assure the

13   appearance of the person, as required, or the safety of any

14   other person and the community that I have to take into account

15   when I decide whether or not somebody should be released or

16   detained.

17       The first factor is the nature and circumstances of the

18   offense charged.  This is under 3142(g), the nature and

19   circumstances of the offense charged, including whether the

20   offense is a federal controlled substance offense; and this, of

21   course, is a federal drug offense.  The defendant is charged

22   with one count of conspiracy in an otherwise lengthy

23   Indictment.  He is only charged in one of the, I believe, 12

24   counts; but it is, obviously, a controlled substance offense.

25       The second factor is the weight of the evidence against

1    the person.  And, candidly, I think -- I'm not super persuaded

2    that this is a strong case against the defendant, at least

3    based on what was presented to me here in court.  I haven't

4    heard from a case agent.  I haven't heard from any witnesses.

5    There's -- there's no controlled buys made against the

6    defendant.  There's no confidential informant information.  The

7    only thing that I have been pointed to is a few snippets of

8    conversations between the defendant and one of the

9    co-defendants, which, admittedly, appear incriminating.  But in

10   the range of cases that I have before me, I cannot say that the

11   weight of the evidence, at least as it has been presented to me

12   today, is strong against the defendant.  I view that factor as

13   kind of a neutral.

14       The next issue is the history and characteristics of the

15   person, and there's a number of things that are encompassed

16   under that more general factor.  The first really go to the

17   issue of whether or not the defendant is a flight risk.  So I

18   take into account the person's character, physical and mental

19   condition, family ties, employment, financial resources, length

20   of residence in the community, community ties, past conduct,

21   history relating to drug and alcohol abuse, criminal history,

22   and record concerning appearance at court proceedings.

23       And then the second factor under this more general factor

24   of the history and characteristics of the person is whether or

25   not they were on parole or probation at the time they committed

1    the alleged offense that brings them before the Court.

2         This is a case where there are things that go both ways as

3    it relates to the defendant.  He most certainly has substantial

4    ties to the Lafayette community.  He has and had employment,

5    and I've been presented evidence that the employment still

6    awaits him.  I've been given evidence that there is a place for

7    him to reside.

8         It is certainly true that he has had substantial drug and

9    alcohol abuse problems, it appears.  Although, he has now been

10   in the Porter County Jail for almost four months, and one might

11   think that that would have helped abate those issues.

12        So I do not in any way, shape, or form feel that the

13   defendant is a flight risk at all, and I sense from the

14   government that they tend to agree with that.

15        The real issue is whether he is a danger, and it's

16   important to note that the question is whether or not he's a

17   danger to the community.  And what the government has pointed

18   me to is three -- albeit, what appear to be very violent --

19   domestic incidents, but it's also true that they are getting a

20   layer of dust on them at this point.  They're at least seven

21   years old, at this point, is the latest incident.  All three

22   incidents, it's important to note, relate to the same

23   individual; and it seems just rather clear to me that there was

24   a very nasty relationship that this defendant must have had

25   with his former spouse and for whatever reason embroiled him in

1    a number of domestic battery incidents.  This is not to his

2    credit -- let's be clear about it -- but that victim is now

3    deceased, and so he's not, obviously, a threat to that victim.

4          The question is:  Is he a threat to the community?  And I

5    just really don't have any evidence that he is a threat to the

6    community.  He might have a proclivity for violence, but it

7    appears that that proclivity for violence was directed at one

8    individual that resulted from this difficult relationship.

9          Again, that's not to his credit, but it does not really

10   help the government's case to establish that he is, in fact, a

11   danger to the community.

12         And so that third factor, I think, is a mixed bag; but if

13   anything, militates more in favor of release.  I do think the

14   defendant has presented a compelling case that there are

15   combinations of conditions that will assure the defendant's

16   appearance at trial and assure his -- or protect the community.

17         And so I'm going to order that the defendant be on home

18   monitoring, and he'll be allowed to leave the home monitoring

19   area to attend drug treatment that will be arranged by the

20   probation department.  If that can be done through Wabash

21   Valley, terrific.  If not, it will be arranged by pretrial

22   services at another location.  He'll be allowed to attend drug

23   treatment, have visits with his attorney, and go to work; but

24   that will be the limit of his release.

25         He will not be released from custody until that home

```
 1    monitoring is arranged.  In other words, that our pretrial

 2    services office has been able to verify that there is a

 3    suitable location for that to all be arranged.

 4        And beyond that, he will be held on a $20,000 unsecured

 5    bond, consistent with the normal rules that apply to that.

 6        Jerry, does that adequately tell you what I have in mind?

 7            THE PROBATION OFFICER:  Yes, Your Honor.

 8            THE COURT:  Okay.  So I will reduce my findings to

 9    writing, as is required by the release and detention statute.

10        Mr. Mahoney, anything else from you?

11            MR. MAHONEY:  No, Your Honor.

12            THE COURT:  Mr. Stracci?

13            MR. STRACCI:  Nothing, Judge.

14            THE COURT:  All right.

15        Again, the defendant will remain in custody until we're

16    able to get those matters worked out.  Thank you.

17            MR. MAHONEY:  Thank you, Your Honor.

18            MR. STRACCI:  Thank you, Your Honor.

19        (A recess was had at 11:22 a.m.)

20                       CERTIFICATE

21        I, Stacy L. Drohosky, certify that the foregoing is a true
      and correct transcript from the record of proceedings in the
22    above-entitled matter.
      Date:  April 16, 2019
23
                              S/Stacy L. Drohosky
24                            S/STACY L. DROHOSKY
                              Court Reporter
25                            U.S. District Court
```

Stacy L. Drohosky, FCRR, CRR, RPR
(219) 852-3462 - stacy_drohosky@innd.uscourts.gov